**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DANIEL R. SMITH**<br><br>                    *Plaintiff*<br><br>            v.<br><br>**STEPHEN S. MCKINNEY, et al.,**<br><br>                    *Defendants* | **Case No. 2:22-cv-02983-JDW** |

## <u>MEMORANDUM</u>

Daniel Smith fled from Rising Sun Police Officers McKinney and Stickney when they attempted a traffic stop. His flight crossed state lines, but his car was not built for speed, so the chase ended when his vehicle got several flat tires. Although Mr. Smith then complied with the Officers' instructions to get on the ground, Officer McKinney injured Mr. Smith as he restrained him. Now, Mr. Smith has sued the Officers, the Police Chief, and the town that employs them under federal civil rights and state tort law. The Defendants moved for summary judgment on all counts.

Because there is a genuine dispute of material fact as to the force that Officer McKinney used to handcuff and restrain Mr. Smith, Mr. Smith's excessive force and failure to intervene claims will be decided by a jury. Since the assault and battery claims depend on the same questions of fact, those too survive. Given the dispute as to whether the Officers' conduct was extreme or outrageous or evinced a reckless disregard for Mr. Smith's rights, a jury will decide the intentional infliction of emotional distress claim and

the determination of punitive damages. The remainder of Mr. Smith's claims are not supported by the evidence and thus I will grant summary judgment for the Defendants on the remainder of those claims.

## I.    BACKGROUND

The Parties have submitted video of much of the encounter between Officers McKinney and Stickney and Mr. Smith. Where possible, I have drawn the facts from that video. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Where the video is not conclusive, or where it does not show events in question, I have resolved factual disputes and drawn reasonable inferences in Mr. Smith's favor. In addition, I have considered the opinions that Mr. Smith's police practices and medical experts have offered. Defendants contend that those opinions "will be the subject of a *Daubert* motion." (ECF No. 30 at 2.) But my Policies And Procedures require a party that seeks to prevail at summary judgment by challenging the admissibility of expert testimony to file a contemporaneous *Daubert* motion. Defendants didn't do that, even though my Policies And Procedures ensured that Defendants would know before they filed their Motion that Mr. Smith was relying on that testimony. In the absence of a *Daubert* motion, I will operate on the assumption that Mr. Smith's proposed experts offer admissible testimony, and I will consider it.

### A.    Parking Lot Interaction

Around 8:40pm on July 18, 2021, Officers McKinney and Stickney received a call from the Sunoco Mini-Mart/Gas Station clerk in Rising Sun, Maryland. The clerk reported

a suspicious person who "entered the store[,] looked around[, and] then exited" and "circled the building." (ECF No. 24-1 at 4.) Officers responded to the scene in separate marked vehicles and found Mr. Smith parked in a bank parking lot behind the Sunoco. Mr. Smith explained that his truck had run out of gas and that a friend was bringing him gas. Officer McKinney inspected the vehicle and saw a gun case on the passenger side of the vehicle. He opened the vehicle's door and the case but did not see a firearm inside. During their interaction, Mr. Smith informed the Officers that he had a criminal history and that his vehicle was uninsured. Officer Stickney instructed Mr. Smith to get his truck out of the area and said that if he saw Mr. Smith driving, he would be cited for driving without insurance (and possibly other offenses). The Officers left Mr. Smith in the parking lot to wait for his friend.

**B.    Pursuit**

A short time later, the Officers saw Mr. Smith driving his vehicle. The Officers followed Mr. Smith. Officer Stickney pulled up alongside Mr. Smith and told him to pull over. Mr. Smith did not comply. Officer Stickney and Officer McKinney each activated his emergency lights, and they both continued to follow Mr. Smith. As Mr. Smith approached the Pennsylvania state line, Officer Stickney again pulled alongside Mr. Smith and instructed him to pull over. Mr. Smith again did not comply. Over the course of the flight and pursuit, which lasted at least seven minutes and spanned at least four miles, Mr. Smith

ignored multiple stop signs. Mr. Smith also drove over a berm and ran over a stop sign. Mr. Smith finally stopped when his truck sustained several flat tires.

### C.    Stop And Arrest

Mr. Smith exited his vehicle with his hands in the air. Officer Stickney ordered Mr. Smith to get on the ground. Mr. Smith complied. As he began to lie face down on the pavement, Officer McKinney ran to Mr. Smith and dropped his knee on Mr. Smith's back to restrain him. Mr. Smith yelled out in pain and defecated himself. While the officers had Mr. Smith on the ground and were handcuffing him, they cursed at him several times. Officer Stickney approached to help handcuff Mr. Smith. After Mr. Smith was handcuffed with his arms behind his back, Officer McKinney continued to restrain Mr. Smith by holding him down to the ground. Officer McKinney placed one hand on the back of Mr. Smith's neck and the other balled in a fist against his lower back. This restraint lasted approximately two more minutes. During this time, Officer Stickney went to both patrol cars to turn off their sirens, found eyeglasses for Officer McKinney, and glanced into Mr. Smith's car. Throughout that time, Mr. Smith was telling the Officers he was hurt and asked why they did what they did.

Officer Stickney then helped sit Mr. Smith up. (*See* ECF No. 24-6 at 7:55-10:50.) Officer Stickney argued with Mr. Smith about whether Mr. Smith put gas in the car and whether he was supposed to be driving his truck at that point. After Mr. Smith was handcuffed and sitting upright, a Pennsylvania State Trooper arrived on scene. The

4

Pennsylvania State Trooper called for an ambulance because Mr. Smith's face was bleeding and he was complaining that he was hurt. The ambulance took Mr. Smith to Jennersville Hospital. There, he received a CT scan that showed he had minimally displaced rib fractures on his left 8th, 9th, 10th and 11th ribs and a small left hemothorax. The treating physician transferred Mr. Smith to a trauma center for further evaluation and monitoring, where he stayed for three days. After his release, Mr. Smith did not seek or require any further treatment.

Upon his discharge from the hospital, Mr. Smith remained in custody on charges of assault, fleeing police, and numerous traffic violations under both Pennsylvania and Maryland law. Pennsylvania withdrew all criminal and traffic charges against Mr. Smith were on April 12, 2022. Maryland *nolle prossed* the criminal and traffic charges against Mr. Smith on June 27, 2022.

**D.    The Officers' Discipline History**

At the time of Mr. Smith's stop and arrest, the Rising Sun Police Department consisted of four individuals: Chief Francis Peterson, Officer McKinney, Officer Stickney, and one other officer. Chief Peterson has been the Chief of Police since 2008 and was the direct supervisor of Officers McKinney and Stickney.

Officer Stickney was the subject of an internal investigation in 2011. That investigation resulted in three findings of misconduct, including inaccurate reporting (six

counts), failing to submit required reports, and unbecoming conduct. These were due to typographical errors in his report and a miscount of CD's recovered for evidence.

In connection with Mr. Smith's stop and arrest, Officer Stickney filed a narrative report of events and Officer McKinney completed a Use of Force Report. Chief Peterson did not perform any subsequent meeting, investigation, or follow-up on the incident as he did not believe the circumstances warranted any action on his part.

### E.    Procedural History

Mr. Smith filed this action on July 29, 2022. The Complaint asserts five counts: Count I against Officer McKinney under Section 1983 for unlawful search and seizure, excessive force, and denial of medical care; Count II against Officer Stickney under Section 1983 for unlawful search and seizure, failure to intervene, and denial of medical care; Count III against Chief Peterson under Section 1983 for supervisory liability; Count IV against the town of Rising Sun, Maryland under Section 1983 for municipal liability; and Count V against Officer McKinney under Pennsylvania tort law for assault and battery as well as Officers McKinney and Stickney for negligent and intentional infliction of emotional distress.[1] On July 21, 2023, Defendants filed a Motion For Summary Judgment on all counts. Mr. Smith opposed the Motion, and it is now ripe for disposition.

-------------------

[1] Counts I and II also included claims for "unlawful pursuit" and Count V also included claims against Chief Peterson and Rising Sun. Mr. Smith consented to dismiss those in his responsive briefing. (*See* ECF No. 29 at 1 n.1, 25 n.2.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott*, 550 U.S. at 378 (alteration in original) (citation omitted). Where there is video footage related to the claims, the Court must not draw inferences that are "blatantly" inconsistent with the video evidence. *Id.* at 380-81. The non-moving party may not "merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

### III.    DISCUSSION

#### A.    Federal Claims

Section 1983 provides a "civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983)). To state a claim under Section 1983, a plaintiff must show that "'some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law.'" *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)).

#### 1.    Claims against Officers McKinney and Stickney

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Courts should not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018). A court need not identify a case directly on point for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017). As an affirmative defense, the burden of establishing qualified immunity falls on to the official claiming it. *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

To determine if an officer's conduct is entitled to qualified immunity, courts ask two questions: (1) whether the defendant's conduct violated a statutory or constitutional

right; and (2) whether the right at issue was clearly established when the conduct took place. *See Sauers*, 905 F.3d at 716. In assessing a claim of qualified immunity, like any other aspect of a summary judgment ruling, the court must not resolve genuine disputes of fact in favor of the moving party; instead, it must decide whether the facts taken in the light most favorable to the non-moving party take the case to a place where the law is not clearly established. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*). The first prong of qualified immunity overlaps with the merits of the liability determination, so I will assess each of Mr. Smith's claims by considering the two-step qualified immunity test.

### a.    Arrest

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop will be deemed a reasonable seizure when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006) (quotation omitted). "A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018). "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an

offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citations omitted).

Officers McKinney and Stickney had reasonable suspicion for stopping Mr. Smith when they saw him driving and probable cause for arresting him after the pursuit. The Officers first interacted with Mr. Smith in responding to a suspicious person call from the nearby Sunoco. Mr. Smith informed the Officers that his truck was uninsured during that initial interaction. So, when they saw Mr. Smith driving the truck a short time later, the Officers knew he was violating Maryland traffic laws. Mr. Smith fled when the Officers attempted to stop him. This resulted in at least a four-mile pursuit over the course of more than seven minutes, even though the Officers had activated their emergency lights and instructed Mr. Smith to pull over. During the pursuit Mr. Smith violated more traffic laws, including running through multiple stop signs and over a concrete berm. The Officers, therefore, had probable cause to arrest Mr. Smith once the pursuit ended. Because Mr. Smith's stop and arrest was reasonable, he does not have a cognizable constitutional claim arising from the fact that he was followed, stopped, and arrested.

Mr. Smith argues that he fled from the Officers because he recognized Officer Stickney from news reports of a recent shooting, so he was afraid. Even crediting that testimony, it doesn't help Mr. Smith because the question is not what Mr. Smith thought. It's what a reasonable officer would have thought, and a reasonable officer seeing what

10

Officers Stickney and McKinney had seen would have had probable cause to stop and arrest Mr. Smith.

**b.      Excessive force**

**i.      Constitutional violation**

Every person has the constitutional right to be free from excessive force while being stopped or arrested, even if the stop or arrest is otherwise proper. The Fourth Amendment demands that officers use no more force than is "objectively reasonable in light of the facts and circumstances" confronting the officer at the time. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Factors to consider in determining that reasonableness include: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether he actively is resisting arrest or attempting to evade arrest by flight. *See Jefferson v. Lias*, 21 F.4th 74, 79 (3d Cir. 2021). Courts may also assess factors, such as the injury to the plaintiff and the duration of the action, when determining reasonableness. *See id.* This is a fact-intensive inquiry that is "normally an issue for the jury." *Id.*

Viewing the facts in the light most favorable to Mr. Smith, there is a genuine dispute of material fact as to whether the force that Officer McKinney used was reasonable. Officers McKinney and Stickney were attempting to stop Mr. Smith for a non-violent offense: driving without valid insurance. In this pursuit, Mr. Smith committed traffic violations and fled from the police, but these were not severe crimes (as evidenced by the

fact that the States withdrew or *nolle prossed* all charges against Mr. Smith). They were also not violent crimes, though they posed a threat to others' safety. That threat stopped when his car did, though.

When Mr. Smith's vehicle stopped, he exited his car without hesitation, with his hands up and his waist visible. At that time, he did not pose a threat to the Officers' safety. And along this empty stretch of road there was no one else around to whom Mr. Smith could be a hazard. Though he had fled, Mr. Smith was complying with the Officers and was in the process of getting down on the ground when Officer McKinney dropped to restrain him. Officer McKinney forcefully drove his knee into Mr. Smith's back to detain him. In that process, Officer McKinney broke four of Mr. Smith's ribs, gave him a small hemothorax, and made Mr. Smith defecate himself. While the decision to arrest and handcuff Mr. Smith was not unreasonable, a reasonable juror could conclude that the force that Officer McKinney used to place the handcuffs on Mr. Smith was excessive.

Once handcuffed, Officer McKinney held Mr. Smith to the ground for an additional two minutes. Officer McKinney restrained Mr. Smith using one hand on Mr. Smith's neck and the other against the small of his back while Mr. Smith complained of his injuries. During that time, Officer McKinney "scrubb[ed]" Mr. Smith's head against the road, resulting in abrasions to Mr. Smith's face. (ECF No. 24-5 at 24.) These injuries were serious enough to require transfer to a trauma center and several days of monitoring. A

reasonable juror could find Officer McKinney's application of force after placing handcuffs on Mr. Smith excessive.

The nonbinding cases that Defendants cite to support their argument that the force was reasonable are not persuasive. The cases all describe a situation where the person subject to arrest was actively resisting the officers. *See Robertson v. McGowan*, No. 1:21-CV-222, 2022 U.S. Dist. LEXIS 152897, at *1 (M.D. Pa. Aug. 25, 2022) ("[O]nce on the ground Robertson began resisting officers by refusing to place his hands behind his back [and] began fighting off officers in a desperate attempt to escape"), *Brown v. Rinehart*, 325 F. App'x 47, 49 (3d Cir. 2009) ("Brown resisted Officer Hazzard by pulling away and laying on his hands to avoid being handcuffed"), *Feldman v. Cmty. Coll. of Allegheny*, 85 F. App'x 821, 826 (3d Cir. 2004) (Plaintiff was "actively struggling when the officers attempted to remove him"). Officer Stickney's bodycam footage shows that Mr. Smith was not resisting Officer McKinney at this time. His hands were up. He went to the ground when instructed. He did not fight Officer McKinney off, even when Mr. Smith said the Officer was hurting him. The cases therefore are not instructive.

### ii.    Clearly established

Because there's a factual dispute as to whether the force Officer McKinney used was reasonable under the circumstances, I must determine whether Mr. Smith's Fourth Amendment right was clearly established. *See Sauers*, 905 F.3d at 716. That determination requires a two-part inquiry. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

First, a court must define the right allegedly violated "in light of the specific case context, not as a broad general proposition." *Id.* (quotation omitted). Second, a court must ask whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (same).

Defendants skip straight to the argument that a reasonable officer would not have known Officer McKinney's actions violated a constitutional right but fail to define what that right is. Mr. Smith defines the right at the highest level of generality as "the right to be free from excessive force." Neither is helpful. Looking at the facts of this case, I define the right as two-fold: the right to be free from 1) the forceful use of an officer's body weight to subdue a cooperating suspect; and 2) the continued use of an officer's body weight to restrain an already prone and handcuffed suspect. To determine if these rights were "clearly established" by July 2021, I look at factually analogous Supreme Court precedent, binding opinions from the Third Circuit, and for a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Id.* (citation omitted).

By the time of Mr. Smith's arrest, it was clearly established that a compliant arrestee has the right to be handcuffed with a nonsignificant amount of force. There does not appear to be a binding Supreme Court or Third Circuit decision, but there is a robust consensus of persuasive authority from other Courts of Appeals. *See Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use significant force on suspects who are only passively resisting arrest.")

(quotation omitted); *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021) (explaining that "it is unreasonable for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious crime"); *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."). If an officer "jump[s] on the back of a prone and compliant suspect" awaiting to be handcuffed with enough force to break the suspect's bones, the officer has violated a clearly established right. *Rogoz v. City of Hartford*, 796 F.3d 236, 250–51 (2d Cir. 2015); *see also Smith v. City of Troy, Ohio*, 874 F.3d 938, 944-45 (6th Cir. 2017) (denying immunity to an officer who "took [a non-resisting suspect] to the ground with a leg sweep and landed on top [of the arrestee]" to handcuff him); *Raiche v. Pietroski*, 623 F.3d 30, 39 (1st Cir. 2010) ("[I]t is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness."). These cases reflect a broad consensus of decisions among the Courts of Appeals, and they are sufficiently analogous to establish the right clearly. *Compare El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020) (citing four published cases from Courts of Appeals as establishing a consensus of persuasive authority) *with id.* at 345-46 (disagreeing, in dissent, that four non-binding cases are sufficient to demonstrate a robust consensus). In addition, at least one Judge in this District has held that the right was clearly

established at least as early as 2008. *See Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 430 (E.D. Pa. 2008) (no qualified immunity for an officer who "pushed" a compliant arrestee to the ground to handcuff her with sufficient force to cause lacerations).

The fact that Mr. Smith had previously engaged the officers in a car chase does not negate that right. For example, in *Smith v. Mattox*, an arrestee threatened an officer with a baseball bat and fled but submitted to the officer's verbal orders once cornered. *See* 127 F.3d 1416 (11th Cir. 1997). The officer then put his knee on the arrestee's back and broke the arrestee's arm while placing the arrestee in handcuffs. The Eleventh Circuit held that the officer was not entitled to qualified immunity even though the suspect was aggressive earlier in their encounter. *See id.* at 1420; *see also Peroza-Benitez*, 994 F.3d at 171 n.7 ("the fact that police may be justified to use force against a fleeing suspect one second, does not necessarily mean that they are justified in using the same degree of force once that individual no longer poses a threat"). That Officer McKinney used this force to apprehend Mr. Smith does not necessarily insulate him. Officers are not permitted to use unfettered violence in their initial restraint of an arrestee. *See, e.g.*, *Samuelson v. City of New Ulm*, 455 F.3d 871, 876 (8th Cir. 2006); *Brown v. Lewis*, 779 F.3d 401, 419 (6th Cir. 2015); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 n.33 (11th Cir. 2017).

Mr. Smith's right to be free from Officer McKinney's body weight once Mr. Smith was handcuffed and lying prone on the concrete was also clearly established at the time of his arrest. *See Keller v. Crawford*, 465 F. Supp.3d 472, 481 (E.D. Pa. 2020) (finding it

clearly established by 2018 that continued force on the back of a subdued arrestee was impermissible). The decision in *Keller* is, of course, not binding on me, but I find its analysis of existing Third Circuit precedent persuasive. Therefore, for the same reasons that Judge Beetlestone offered in *Keller*, I conclude that it was clearly established at the time of the Officers' encounter with Mr. Smith that once an individual is subdued and non-resisting, that individual no longer poses a sufficient threat to warrant the continued application of force by pressing body weight into the back of a handcuffed person.

### c.     Failure to intervene

"[A] police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force," but only "if there is a realistic and reasonable opportunity to intervene." *El*, 975 F.3d at 335. Whether there is an opportunity to intervene may turn on how much time the officer had to do so. "Where an incident is momentary, its brevity may defeat a failure-to-intervene claim." *Id.* (cleaned up).

Defendants' brief does not address this claim. Based on the record, I cannot say that Officer Stickney is entitled to judgment as a matter of law. While alleged excessive force lasting just five seconds would not create a genuine issue of fact, the same force lasting for minutes might. *See id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995)). The process of Officer McKinney subduing and then restraining Mr. Smith lasted longer than seconds. During this time, Officer Stickney's bodycam footage shows him turning off the sirens on the patrol cars, obtaining glasses for his colleague, and talking

to Officer McKinney. A reasonable jury could conclude that Officer Stickney had the time and opportunity to intervene but failed to do so.

Mr. Smith's right to this intervention was clearly established at the time of his arrest. *See Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (collecting cases). Because the question of whether Officer McKinney's actions constituted excessive force is one for the jury, and because Officer Stickney may have had enough time to intervene, a jury will also decide this claim.

### d.      Denial of medical care

The Due Process Clause of the Fourteenth Amendment provides protection for arrestees from inadequate medical care. *See Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014). Courts apply the same standard to these Fourteenth Amendment claims as that of Eighth Amendment claims of inadequate medical care. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). To succeed on an inadequate medical care claim, a plaintiff must demonstrate (1) a serious medical need; and (2) that the defendants were deliberately indifferent to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

From Mr. Smith's three-day stay in a trauma center, I determine that his medical need was serious. *See Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (a serious medical need is "one that has been diagnosed by a physician as requiring treatment"). However, Officers McKinney and Stickney were not "deliberately

indifferent" to those medical needs. After Mr. Smith was handcuffed, a Pennsylvania State Trooper arrived at the scene and soon after called for an ambulance. As Mr. Smith acknowledges "the delay in medical care being summoned was not more than several minutes." (ECF No. 29 at 19.) There are no facts to suggest that Officers McKinney and Stickney obstructed or prevented this call for help or Mr. Smith's treatment. *See Lanzaro*, 834 F.2d at 346 (deliberate indifference is shown if necessary medical treatment is delayed for non-medical reasons). Nor is there evidence that they delayed in calling for help. The bodycam footage reveals that they secured Mr. Smith and the scene—all reasonable things to do—and then assented to having Mr. Smith checked medically. And Mr. Smith received prompt and appropriate treatment for his serious injuries. Mr. Smith seems to base his claim on the fact that the Officers were not the ones who called for an ambulance, but the deliberate indifference standard cannot require that *every* officer at the scene radio for assistance, and Mr. Smith cites no cases to support that proposition. Because the Officers were not deliberately indifferent, they are entitled to summary judgment on this claim.

### 2. Claims against Chief Peterson

A supervisor like Chief Peterson can only be liable for a constitutional violation if he is personally involved in the violation. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can mean personal participation in the violation,

direction of others to violate rights, or knowledge of and acquiescence in a subordinate's behavior. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010).

A plaintiff can prove supervisory liability by showing that a supervisor implemented a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001). To prove such a claim, a plaintiff "must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk[,] and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure." *Id.* The requisite "unreasonable risk" is "[n]ormally . . . shown by evidence that such harm has in fact occurred on numerous occasions." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Alternatively, a risk may be unreasonable if it is "so great and so obvious." *Id.*

Mr. Smith contends that Chief Peterson had a pattern of turning a blind eye to his officers' use of force and how those incidents were documented. But he has no evidence to support that argument. In fact, there's no evidence of the existence of the practice that Mr. Smith posits. Although he claims that Chief Peterson turns a blind eye to the use of force, he does not point to any other instances where Rising Sun officers used force, let

alone that Chief Peterson failed to investigate those instances. Without such evidence, there can be no evidence of a policy or custom.

Mr. Smith tries to salvage his claim by relying on the way that Chief Peterson investigated the incident at issue in this case. But Chief Peterson's investigation of this incident could not have impacted the way that the Officers conducted themselves in the incident itself. Mr. Smith suggests that Chief Peterson's investigation of this incident is indicative of his approach to use of force investigations generally, but without some evidence of other uses of force to be investigated, that's a logical leap, not a reasonable inference. The cases that he cites to the contrary all address when a failure to investigate demonstrates a supervisor's knowledge and acquiescence in an officer's pattern of conduct, not just the general logical leap that a supervisor doesn't investigate anything. *See Forrest v. Parry*, 930 F.3d 93, 115 (3d Cir. 2019). The law does not permit me to make that leap without some evidentiary support.

Mr. Smith also suggests that Chief Peterson should have conducted regular analyses of Rising Sun's officers' uses of force. Maybe that would have been a better practice. But there's no evidence that his failure to do so led to this incident. There's nothing to suggest that he would have identified other incidents, or that his failure to conduct such annual reviews led to officers being lax about using force. In short, there's nothing to tie this argument to the violation that allegedly occurred.

21

Finally, the single administrative disciplinary action against Officer Stickney cannot support a claim for supervisory liability. That violation occurred 10 years before this incident and related to accurate recordkeeping, not to the use of force. Given how untethered that violation was to this incident, it cannot have put Chief Peterson on notice that Officer Stickney (or Officer McKinney) would engage in such conduct. *See Sample*, 885 F.2d at 1118.

### 3.    Municipal liability

A plaintiff that pursues a claim of municipal liability under Section 1983 may proceed in two distinct ways. The first avenue requires a plaintiff to "put forth that an unconstitutional policy or custom led to his . . . injuries." *Forrest*, 930 F.3d at 105 (cleaned up). To prove an unconstitutional custom, a plaintiff must show "that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citation omitted). A plaintiff must also show that the custom was the proximate cause of his injuries by demonstrating an "affirmative link" between the custom and the constitutional violation he alleges. *Id.*

The second avenue to pursue municipal liability requires the plaintiff to show that his injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest*, 930 F.3d at 105 (cleaned up). That is, a plaintiff must show that a municipal government's failure to supervise, discipline, or train its

officers "amounted to deliberate indifference to the rights of the individuals with whom those officers would come into contact." *Id.* at 107. Most of the time, a plaintiff must show a "pattern of similar constitutional violations by untrained employees" to show a failure to train. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

Mr. Smith pursues his municipal liability claim under both theories. Neither is successful. *First*, Mr. Smith has no evidence of a custom or practice of either excessive force or a failure to intervene on the part of Rising Sun officers. *Second*, Mr. Smith has no evidence of deliberate indifference. He has not suggested that Rising Sun failed to train its officers. To the extent he suggests that it failed to discipline them or failed to supervise them, those arguments fail for the same reasons that his claims against Chief Peterson fail. There's no evidence that Chief Peterson or anyone else from Rising Sun was deliberately indifferent to Mr. Smith's or anyone else's rights.

**B.    State Law Claims**

**1.    Immunity under the PSTCA**

With certain exceptions, Pennsylvania's Political Subdivision Tort Claims Act immunizes a "local agency" and its employees from tort liability for events that happen in the course of government business. *See* 42 Pa.C.S. § 8542. The Act defines "local agency" as "a government unit other than the Commonwealth." *Id.* at § 8501. The Act does not define "government," so under Pennsylvania law, I must give the term its plain and ordinary meaning. *See* 1 Pa.C.S. § 1903(a).

On its face, Rising Sun is a government unit. In determining the term's common use, once can consider how a common person would understand the term. *See Wooden v. United States*, 595 U.S. 360, 367 (2022). A municipal corporation that exercises authority in a particular locality is just that—a government unit. Whether described as a "municipal government," "local government," or "city government," the key is that everyone understands the local authority to be a form of government. And that understanding fits the dictionary definition of "government" at the time the General Assembly adopted the PSTCA: a "government" includes "city and township governments" and is the "whole class or body of officeholders or functionaries considered in the aggregate, upon whom devolves the executive, judicial, legislative, and administrative business of the state." Black's Law Dictionary 625 (5th ed. 1979). Although the parties argue about whether the PSTCA applies to Rising Sun, neither grapples with the statutory text, which defines the scope of the Act. And nothing in the Act suggests that it applies only to government units in Pennsylvania.

Although the Act describes certain types of Pennsylvania entities that fall within its scope, it states that it applies to all government units, "including but not limited to" the types listed in the statute. The phrase "including but not limited to" indicates the General Assembly's understanding that the term is broader than the specific examples. Indeed, the Act does not list many types of Pennsylvania government units, such as townships, cities, and boroughs, so I cannot read it to be an exhaustive list of the types of

entities to which it applies. Also, at the time the General Assembly adopted the statute, it was foreseeable that police officers or other officials from a neighboring state might cross into Pennsylvania and then face a lawsuit. Yet the General Assembly did not include any language indicating its intent to limit the statute to Pennsylvania government units. For example, it does not say that it applies to government units that are "created by act of the Commonwealth" or include a citation to other parts of the Pennsylvania statutes that create those entities. All of this suggests that the General Assembly did not intend to limit the PSTCA's application only to Pennsylvania entities.

Because the Act applies to this dispute, it bars any tort claims that do not fall within one of the Act's enumerated exceptions. The Act excepts torts arising from "willful misconduct." 42 Pa. C.S. § 8550. That term is synonymous with an intentional tort. *See Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006). When a police officer "desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue," then immunity is inapplicable. *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1023 (Pa. Commw. Ct. 2014). Mr. Smith's claims of assault, battery, and intentional infliction of emotional distress all constitute intentional torts that, if proven, would fall within the exception for willful misconduct. The PTSCA does not bar them.

No exception applies to Mr. Smith's claim for negligent infliction of emotional distress. The Act creates limited exceptions to immunity for causes of action sounding in

negligence. *See* 42 Pa. C.S. § 8542. None of those exceptions applies to Mr. Smith's claim. Therefore, the negligent infliction of emotional distress claim fails.

### 2.     Merits of the claims

#### a.     IIED

Intentional infliction of emotional distress requires that: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) that distress must be severe." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979). Mr. Smith has evidence of the first element, which is the only one that Defendants challenge. If the Officers acted out of anger—and there's evidence on the video from which a reasonable juror might think that they did—that could constitute extreme and outrageous behavior. Because Defendants don't argue about the other elements of the claim, I do not have to address them.

#### b.     Assault and battery

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). "The question of whether an officer is liable for assault and battery under Pennsylvania law turns on whether he or she has used an excessive degree of force, as a matter of Fourth Amendment law, in dealing with an arrestee." *Garey v. Borough of Quakertown*, No. CIV.A. 12-0799, 2013 WL 3305222, at *7

(E.D. Pa. July 1, 2013). Because there is a genuine dispute as to whether Officer McKinney used excessive force against Mr. Smith, Officer McKinney is not entitled to summary judgment on the assault and battery claims against him.

### C.    Punitive Damages

"A jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The standard is disjunctive, meaning a jury may award punitive damages if defendants were "at a minimum, reckless or callous." *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989). Punitive damages are not the norm and should be limited to situations where "defendant's conduct amounts to something more than a bare violation justifying compensatory damages." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978). The availability of punitive damages is usually a question of fact reserved for a jury. *See Keller*, 465 F. Supp. at 485.

Both Officers cursed at and disparaged Mr. Smith when his car came to a stop. This foul language continued as the Officers handcuffed and restrained Mr. Smith, even as Mr. Smith complained of his pain. From those videos, a reasonable juror could conclude that anger or some related evil motive motivated one or both Officers. A jury could also find that the Officers were reckless to Mr. Smith's right to be free from excessive force. Either

way, I find it more appropriate to allow a jury to determine whether Mr. Smith is entitled to such damages.

## IV.    CONCLUSION

Mr. Smith's claims against Officer McKinney for excessive force, assault, battery, and intentional infliction of emotional distress, and his claims against Officer Stickney for failure to intervene and intentional infliction of emotional distress may proceed to a jury. Defendants are entitled to summary judgment on the remainder of the claims. An appropriate Order follows.

BY THE COURT:

/s/ Joshua D. Wolson
HON. JOSHUA D. WOLSON
United States District Judge

October 6, 2023